**Ann THIEL, Plaintiff,**

v.

**VILLAGE OF LIBERTYVILLE,
Defendant.**

No. 94 C 2505.

United States District Court,
N.D. Illinois,
Eastern Division.

Dec. 16, 1996.

---

Paul Leslie Shelton, Shelton & Associates, Hinsdale, IL, for plaintiff.

John Robert Spitzig, Claudia J. Lovelette, Robert William Vyverberg, Jr., Burke, Weaver & Prell, Chicago, IL, Arthur Stephen Bresnahan, Kenneth Thomas Garvey, Bresnahan & Garvey, Chicago, IL, for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

NORGLE, District Judge.

This court conducted a bench trial in which Plaintiff Ann Thiel ("Thiel") sought to recover against Defendant Village of Libertyville ("Village"). She alleged that she endured sexual discrimination and sexual harassment while serving as a police officer with the Village's police department.

## I. LEGAL STANDARDS

■ Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, prohibits employers from discriminating against individuals differently based on, among other immutable characteristics, their gender.[1] After trial, the traditional burden-shifting issue of Title VII analysis becomes moot. *Melendez v. Illinois Bell Tel. Co.*, 79 F.3d 661, 667 (7th Cir.1996) (citing *Allen v. Seidman*, 881 F.2d 375, 379 (7th Cir.1989)). "Once the lawsuit has been tried, the relevant inquiry simplifies to whether the evidence presented at trial supports a finding of a Title VII violation." *Id.*

## II. FINDINGS OF FACT[2]

Following are the relevant facts based upon the testimony of witnesses and documentary evidence:

Thiel received a Bachelor of Science degree in Criminal Justice from Loyola University Chicago in 1988. On July 10, 1989, the Village hired her as a police officer. Police officers hold dangerous jobs, their primary mission being to protect the public. At the time the Village hired Thiel, it employed a total of thirty-six other police officers; including Thiel, two of those officers were female. Throughout the 1970s and 1980s, the Village employed four female probationary officers, including Thiel.

In the Village Police Department ("Department"), newly-hired officers remain on probation for a period of one year, which is extendable for three additional months. By Department policy, the officers may be terminated at will, including for no reason at all, during that period of probation.

Chief Roger H. Stricker ("Stricker") testified that the Department is small and has limited resources. The Department has a large financial investment in each probation-

---

1. Thiel's claim arises from conduct alleged to have occurred in 1989. The United States Supreme Court has held generally that courts shall not apply the Civil Rights Act of 1991 to conduct which occurred prior to November 21, 1991. *See Landgraf v. USI Film Products*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994); *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994). Thus, the court will apply the version of Title VII in effect prior to that date.

2. The following findings of fact have been compiled by the court, consistent with its own findings, from the parties' proposed findings of fact. The court commends Plaintiff's counsel for careful attention to detail and relevant, binding, case law in his submission.

ary officer. Probationary officers are generally evaluated on a monthly basis through a twenty-four area Performance Evaluation Report. However, like most evaluations, determination of performance levels in various areas (e.g., knowledge of Village streets, initiative, ability to prioritize assignments, morale) must be made by superior officers based upon their subjective observations. During Thiel's tour as a probationary officer with the Village, there were four other probationary officers: Scott Fabbri ("Fabbri"), Robert Proctor ("Proctor"), Ed Rancone ("Rancone"), and Ed Mone ("Mone").

Between July 10 and September 29, 1989, Thiel successfully completed a ten week program at the Police Training Institute ("Institute") in Champaign, Illinois. The Department does not expect that new officers will acquire all necessary knowledge at the Institute; rather, the Department expects that the probationary period will provide new officers with practical experience and skills necessary for police work. After Thiel completed the Institute, the Director of the Institute called Stricker. The Director informed Stricker that Thiel was the most negative person who ever attended the Institute, and that she had a propensity to complain about any-and-everything.

Thiel began working for the Department on October 1, 1989, as a probationary police officer. At that time, Thiel received a training manual and a copy of the Department's general orders. Shortly thereafter, Stricker met with Lieutenant Bruce Scheibler ("Scheibler"), Commander Charles Bouland ("Bouland"), and Thiel regarding the Institute Director's comments.

Sergeant Erv Schamal ("Schamal") was one of Thiel's immediate supervisors. All other non-probationary officers that worked Thiel's shift were also considered her supervisors. Schamal was under the command of Bouland. Schamal has worked for the Department for over twenty-nine years. Schamal took a two-week course on how to supervise in 1983. Along with his knowledge from this course, he used his experience, rather than a written manual or order, when determining how to supervise probationary employees. In 1989, Schamal had not taken

any seminars or training regarding sexual discrimination. However, he was generally familiar with sexual discrimination laws and the Village's policy concerning sexual discrimination.

Early in Thiel's tenure, various supervisors in the Department became concerned about her performance because various officers who worked with her found her performance deficient. For example, she exposed her gun during a traffic stop in violation of Department rules. Also, in October, Thiel and Officer Hein were partners on a shift. They stopped three minors for possession of alcohol in a local park. While Hein arrested the first perpetrator, the other two ran from the scene; for an unknown reason, Thiel neglected to chase them.

When Schamal rode with Thiel, he reprimanded her verbally the first time she rolled through a stop sign. When she continued to do so, he did not discuss the matter further with her. In her monthly evaluations, Schamal repeatedly reprimanded Thiel for continually rolling through stop signs.

Schamal and Scheibler prepared Thiel's October 1989 evaluation. Schamal prepared the evaluation based upon his personal observations of her work, and his conversations with other officers. Thiel signed this evaluation, as she did her subsequent monthly evaluations. Although she states that her signature did not indicate agreement with the content of the evaluations, she never discussed the content of the evaluations with her supervisors or complained, despite the opportunity to do so at the time of each signing. She simply sat across the desk and said nothing, while her supervisor awaited some reaction. Further, she never documented her disagreements with the content of the evaluations during her tour with the Department. Thiel did document those disagreements *after* she resigned.

In early November 1989, the Department began evaluating Thiel on a daily basis. The Department had not found it necessary to use this procedure before, but did so for Thiel in an effort to train, evaluate, and monitor her. None of the other (male) probationary officers received daily reviews.

However, there is no evidence that any of them were having difficulties similar to Thiel's.

Schamal told the officers riding with Thiel to record everything they observed while on patrol with Thiel on a Daily Progress Report. The daily reports were summarized in Thiel's monthly evaluations, and she was given the opportunity to discuss them with her supervisors, although she chose not to do so. Officers Hein, Hershey, Mack, Schamal, Bouland, Smith, and Stricker discussed Thiel's performance with her personally. Her response was essentially to listen unemotionally.

Officer Sandra Pierce ("Pierce") [3] generally did not assist in training officers. However, on November 13, 1989, Schamal asked her to ride with Thiel and to report on what occurred during their ride. Schamal testified that he asked Pierce to ride with Thiel in order to get "another woman's perspective" on Thiel's performance, as Thiel had only been riding with male officers.

Pierce's report on her shift with Thiel stated that, while Thiel operated the police vehicle, she nearly struck a child riding a bicycle along the side of the road. Further, Thiel almost hit a man putting his garbage cans out near a curb. Thiel also made an inappropriately wide right-hand turn which scared Pierce. Although Pierce began the ride as a passenger, she took control of the vehicle as the driver during the shift. Despite the three incidents of poor vehicle operation, Pierce's report states that, on that shift, Thiel was able to find Village streets and was able to "handle the vehicle." Pierce does not believe that she discussed her report with Thiel after writing it.

On November 14, 1989, Stricker asked other supervisors what could be done to save Thiel from termination. He also asked them to devise a plan which would remedy her weaknesses (i.e., driving, safety habits, initiative, knowledge of Village streets).

Bouland recommended termination of Thiel on November 21, 1989. However,

overruling Stricker's own "better judgment," Stricker decided to give Thiel one last chance for continued employment. Bouland advised both Stricker and Scheibler of the need for documentation which would better evaluate Thiel's progress.

On November 27, 1989, Stricker held a meeting regarding Thiel's performance with Scheibler, Bouland, and Thiel. Stricker was particularly concerned about Thiel's safety practices, driving ability, knowledge and participation in arrest procedures, sense of priority and lack of initiative, and knowledge of Village streets. Stricker recommended that Thiel execute the policies and practices taught at the Institute and on the job. Concerned about her driving, he also suggested that she get an eye exam and noted that she would not be allowed to drive a police vehicle alone until she did so. In a handwritten note prepared immediately following the meeting, Stricker remarked that Thiel's monthly evaluations demonstrated that her performance was "going backwards instead of forwards," and that she would have to show a marked improvement over the next several weeks to keep her job.

Thiel's November evaluation indicates that her performance remained unsatisfactory: she was a poor driver, she lacked proper and necessary observation skills, she was careless on traffic stops, she lacked proper radio skills, she was unable to maintain composure in routine situations and panicked in emergencies, she did not know the streets as well as she should have, and she was unsure of how to answer alarm calls. Once again, Thiel signed the evaluation without comment or question. As usual, she did not seek to review her evaluation with any officer along the chain of command.

On December 4, 1989, Thiel underwent an eye exam. The examining doctor's report read "normal eyes," "normal depth perception," and "normal peripheral vision." In early December, Stricker allowed Thiel to ride alone, despite Schamal's recommendation to the contrary. Stricker wanted to put Thiel out on her own to give her one more

3. The Village hired Pierce in July 1983. Before coming to the Department, she had been an officer in Lindenhurst, Illinois. She is the only female officer to satisfactorily complete the Department's probationary period.

chance to prove herself. Suspecting that she might be a "late bloomer," Stricker wanted to see if Thiel could, "as they say in the sports world, fish or cut bait." (Stricker Trans. at 40.) Pierce testified that officers are generally allowed to ride alone when they are "somewhat" aware of the street and can respond to calls. Officers who ride alone should be aware of Village happenings, and should be able to handle radio traffic. Officers riding alone should also know when to ask for assistance and do so when necessary.

Thiel's December evaluation indicated that her performance remained unsatisfactory. Stricker noted that her attitude seemed to be worsening. The supplements to her evaluations indicated that she argued with lawful orders, which was not a "good sign" in a probationary employee. Schamal noted that he thought the Village was fighting a lost cause because of a distinct change in Thiel's attitude. For example, she was unaware of happenings around her: she did not recognize suspicious circumstances or properly monitor radio traffic. Thiel signed the evaluation. She neither commented nor complained.

In early January, Schamal decided to perform a training exercise with Thiel. Schamal had not used the exercise on any other probationary officer in the past. It involved Schamal putting his business card on the doors or windows of businesses which officers were supposed to check. The cards were attached to a note instructing the officer to call Schamal when the officer found the card. At the end of their shifts, the officers would turn the cards into their shift commander. Schamal would use this procedure to insure that the officers were checking businesses and to test their powers of observation.

Although Schamal did not tell Thiel about the exercise until the second night he decided to use it, another officer tipped her off and helped her find the cards. Bouland testified that an officer probably wouldn't find some of the cards unless the officer knew of the exercise because the officer wouldn't be able to check every building. The first night, Thiel returned with three of Schamal's five business cards. Thiel found no cards the second night or simply did not obey the order to find them and turn them in.

Officer Hein told Schamal that Thiel thought the exercise was a "second grade treasure hunt" and a "wild goose chase." When Schamal confronted Thiel about her comments, Thiel refused to engage in the exercise again. She said that she was being singled out and abused. Schamal raised his voice at Thiel and told her that she was not doing a very good job. He occasionally raised his voice at other officers. He raised his voice at Thiel because he had already tried everything except shouting in an attempt to get Thiel to react, but to no avail.

On January 2, Schamal was riding with Thiel. Two men in a pickup truck left a corporation's property at approximately 2:00 a.m. and pulled out in front of Thiel's squad car. Thiel made no effort to get the license plate number or to determine why the truck was there at 2:00 a.m. Schamal stated that Thiel should have recognized the incident as suspicious.

On January 3, 1990, Thiel received a written warning for arriving thirty minutes late for work. Thiel reported to work late that day because she had to return home from the station to get something she had forgotten: her gun. She did not tell her supervisors that she was leaving. Bouland stated that the situation did, indeed, warrant a warning. When Thiel did return, she had problems finding a radio.

On January 5, 1990, Thiel received yet another written reprimand for the following incident. By way of background, the Department considers officers riding on the same shift in the same Village district to be partners. Although not mandatory, it was understood in the Department that officers should cover their partners on routine traffic stops. Officers could permissibly meet during their shifts to discuss the day's events, and the officers had the responsibility of using their judgment and common sense (including consideration of work obligations and duties) regarding the appropriate length of time to do so.

On January 5, Schamal wrote up Thiel for meeting with one of her training officers for

over an hour when she should have been covering her partner on a routine traffic stop. The officers parked their patrol cars side to side as they conversed. Because Thiel did not include the conversation with her training officer in her activity report for the day, the write up also stated that Thiel falsified the report. Although Thiel states that the meeting lasted under an hour, Schamal states that he followed Thiel, and watched Thiel and the training officer meet for sixty-five minutes. No one called the write up to Thiel's attention until January 14, 1990. When the training officer evaluated Thiel, he found that she was not yet competent, but that she "could" become a competent officer.

Thiel was also written up for the following behavior. Thiel arrived at the scene of a fatal drunk-driving accident. Thiel wrote in her report that Officer Finn, also at the scene, had asked for "Breath *and* Blood samples," which the defendant driver refused to produce. In his supplement to the report, Schamal, who had been at the scene, wrote that Finn had actually asked for "Breath *or* Blood samples," and that Thiel's mistake might "cost the case." Bouland thought the report was "satisfactory." Schamal, however, thought that Thiel had shown a lack of common sense on that night. The temperature was twenty-below-zero, and Thiel had just returned from being sick with a cold. She was walking around outside with no hat or gloves, and her jacket was unzipped.

During the time Thiel worked for the Department, Pierce heard Schamal refer to Thiel as a "cunt" in the presence of Pierce and other officers. There is no indication that Thiel was present at the time of Schamal's reference, or that Thiel knew of it prior to her termination. Schamal has referred to Pierce as a "bitch" but Pierce is not bothered by it. Schamal denies ever using such terms in reference to Thiel.

At one point during Thiel's tenure with the Department, Lake County Sheriff's Deputy Tom Arnold complained to the Department about Thiel's driving. Arnold told the Department that he encountered Thiel driving in the snow, and that he had to "fishtail" his own car in order to avoid an accident caused by Thiel. When confronted with the complaint, Thiel simply stated that Arnold was "blowing it out of proportion. It wasn't that bad."

During the time Thiel worked for the Village, she accumulated seven sick days. She took 2.3 hours of that time during her training at the Institute, and used a total of six days. In a supplement to an evaluation, Schamal stated that Thiel was abusing the sick leave policy in that she had called in with "cramps" on two occasions. Schamal testified that he wrote that Thiel had "cramps" because that is what Thiel told Schamal while using an arrogant tone. Schamal also explained that he felt Thiel abused the policy because she tended to take sick days either right before or right after her days off, thus giving her longer breaks between work weeks. This placed a burden on other officers to cover her shifts.

Thiel testified that, on two separate occasions, Stricker patted her on the head and referred to her as "sweetheart" as she sat at a desk working on reports and as Stricker walked past her without stopping. Thiel did not recall the dates or situation surrounding these incidents. Stricker testified that to do so would not be in his nature. Thiel was offended and irritated, but did not complain because, overall, her general feeling was that Stricker was fair to her.

Because Thiel's name was on a list for employment with the City of Chicago Police Department, Thiel was given the option of resigning in lieu of termination on January 17, 1990. It is a common practice for the Department to give employees such an option. An employee contact form indicates that, at an exit interview, Stricker informed Thiel that the Department was going to terminate her based upon her lack of performance and progress as a probationary officer. A handwritten note attached to the contact form states that Stricker told Thiel that she demonstrated the following deficiencies: failure to follow safety procedures; difficulty driving, especially in emergency situations; improper prioritizing; lack of initiative, or standing behind in arrest situations; inappropriately "laid-back" attitude; lack of knowledge of Village streets. Thiel was not mastering basic skills necessary for

success in a dangerous profession. Stricker made the final decision to terminate Thiel. But Thiel was not alone: Proctor also did not complete the probationary period. Like Thiel, he chose to resign rather than to be terminated.

The court notes that Thiel's testimony does not, for the most part, run at all contrary to its findings. The court finds that her testimony was generally credible. Thiel did not dispute the alleged deficiencies in her performance, although she subjectively thought that her overall performance improved during her employment. However, the court finds that Thiel's attitude during her tenure at the Department was often apathetic and, at times, hostile.

## III. CONCLUSIONS OF LAW

### A. *Generic Gender Discrimination*

■ To establish a case of wrongful termination based on gender in violation of Title VII, Thiel must show that she performed her job duties in a satisfactory manner and that the Department treated her differently than similarly-situated male employees. *Samuelson v. Durkee/French/Airwick*, 976 F.2d 1111, 1113 (7th Cir.1992). She has not done so.

■ First, she has not shown that she performed satisfactorily. The court is far from satisfied that Thiel met the skill or personality qualifications necessary to succeed as a police officer, a dangerous position in which both skill and personality may mean the difference between life and death.[4] As discussed above, the Village produced evidence of numerous, documented, deficiencies in Thiel's performance and personality which made her unsuitable for employment as a police officer. Although Thiel produced minimal evidence of sporadic times when she showed acceptable performance and improvement throughout her tenure with the Department, the overwhelming testimony and documentary evidence leads to the inference that Thiel, although she may have had some unexercised potential, was not performing as necessary. The court notes, "An employee's self-serving statements about [her] ability

... are insufficient to contradict an employer's negative assessment of that ability." *Gustovich v. AT & T Comms., Inc.*, 972 F.2d 845, 848 (7th Cir.1992) (citation omitted). Thiel herself admitted that the majority of the evidence in the reports and write ups was accurate. Although she offered explanations for her failure to perform, she did not show that she actually did perform satisfactorily. Thus, the Village takes the position that she was terminated not because of her sex, but because she was incompetent. The court agrees with the Village's position and finds that Thiel has not demonstrated that she performed her duties as a police officer in a satisfactory manner.

■ Second, Thiel has not shown that any male employees were "similarly situated." To have done so, Thiel must have pointed to male employees who had similar work and attendance records but were not terminated. *See Rush v. McDonald's Corp.*, 966 F.2d 1104, 1112 (7th Cir.1992). Such a comparison must "demonstrate more than occasional leniency toward other employees who had engaged in conduct of a similar nature." *Hiatt v. Rockwell Intern. Corp.*, 26 F.3d 761, 771 (7th Cir.1994).

Thiel made no such comparison. Thiel herself admitted on the witness stand that her monthly and daily evaluations were relatively accurate, and that the several specific problems and misconduct noted was, for the most part, true. She did not object or complain about the reports. Indeed, she affixed her signature to them. Thiel has not shown that any male probationary employees were similarly situated, much less that similarly situated male probationary employees were treated differently. Indeed, the evidence shows that another probationary officer was also terminated, and that the other officer was a male. The court does not know the reasons for his termination.

### B. *Sexual Harassment*

■ To establish that she was sexually harassed in violation of Title VII, Thiel would have had to show harassment which was sufficiently severe or pervasive to alter the

---

**4.** *See, e.g., Sledd v. Linsday*, 102 F.3d 282 (7th Cir.1996).

terms, conditions, or privileges of employment and that male employees were not subjected to similar treatment. *See Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405–06, 91 L.Ed.2d 49 (1986). She did not do so. For her sexual harassment claim, Thiel relies entirely upon Stricker's reference to her twice as "sweetheart" while patting her head, Schamal's single reference to her as a "cunt," Schamal's written report that Thiel missed work because of "cramps," and the business card and daily progress report procedures [5]. The Seventh Circuit has declared, "It is obvious that a single, isolated ... comment could not reasonably be thought to constitute sexual harassment or to cause a harm sufficiently great to repay the expense of suit." *Galloway v. General Motors Serv. Parts Ops.*, 78 F.3d 1164, 1167 (7th Cir.1996) (noting that the use of the term "sick bitch" "may be defensive; may be playful rather than hostile or intimidating; may be colored by tone or body language; ... may be done in a placating, conciliatory, or concessive manner in an effort to improve relations with hostile or threatening coworkers" (citations omitted)).

Despite Stricker's denial that he twice asked Thiel, "How's it going, Sweetheart," the court finds that he probably did so. Thiel's testimony was credible on that point. However, other than the two incidents with Stricker, Thiel testified that Stricker treated her fairly. She did not recall the date of either "sweetheart" incident and she did not complain about the incidents. The court finds that the comments were simply made in passing as an expression of concern about a probationary officer, and were in no way sexual. However, the "Sweetheart" reference did likely relate to Thiel's gender, as the court doubts that Stricker would have referred to a male probationary officer as "sweetheart." The court notes that Thiel has produced no evidence which suggests a nexus between Stricker's remarks and the contested termination. *See Cheek v. Peabody Coal Co.*, 97 F.3d 200, 203 (7th Cir.1996).

Next, as to Schamal referring to Thiel as a "cunt," Thiel does not state that she overheard the reference or that she knew about it until after her termination and the court finds that she did not know of it. Harassment, by definition, requires annoyance or torment. *Webster's II New Riverside University Dictionary* 564 (1984). The court finds that Thiel could not have been annoyed or tormented, or "harassed," by a reference of which she had no knowledge.

Alternatively, the court recognizes that the term "cunt," taken out of context, may be considered to reference particular female characteristics and to evidence sexual discrimination. *See Galloway*, 78 F.3d at 1167 (noting that the term is more sexual in nature than "bitch," and finding that plaintiff could not have inferred sexual discrimination from a certain use of the term "bitch," considering the context). However, as undignified and unfriendly Schamal's reference may have been, in the context of all the facts shown in this case, the court finds that it was not related to Thiel's gender, but rather to Schamal's intense frustration and dislike of Thiel because of her incompetence, indifference, and insubordination. Beyond that, the court has no evidence which would lead it to speculate about any of Schamal's deep-seated subjective feelings which could have been reflected in his reference.

As to Schamal's "cramps" reference, Schamal testified that Thiel herself, or the dispatcher, probably told Schamal that she was not at work because of cramps, and that Schamal would not have fabricated his comment. The court has no basis on which to discredit his testimony. Thiel cannot claim that she was harassed by her own comment.

Considering all conduct together, the court finds that Thiel has not shown conduct sufficiently severe or pervasive to alter the terms, conditions, or privileges of employment and that male employees were not subjected to similar treatment. Stricker's "Sweetheart" comments may have been offensive. However, they were two isolated incidents in long period of, by Thiel's own testimony, fair

---

5. The court will address the business card and daily report procedures in a separate section below.

treatment from Stricker. Schamal's "cunt" reference would certainly be offensive, had Thiel known about it. However, again, it was clearly not the product of a discriminatory dislike of Thiel because of her gender, but rather of a genuine personality conflict, regardless of gender. Even considering all evidenced conduct together, Thiel did not establish sexual harassment at trial. She has not shown a hostile work environment which altered the terms or conditions of her employment because of her gender.

### C. Business Card Procedure/Daily Progress Reports

■ Thiel seems to take the position that the business card procedure and daily progress reports were part of the gender discrimination and sexual harassment of which she complains. Thiel did show that male officers were not subjected to daily progress reports or to the business card procedure, and that she was annoyed by the procedure. The court is not convinced, however, that these procedures were in any way "sexual" or "because of her sex."

Also, Thiel failed to rebut the Village's explanation for employing the two procedures during her probation. The Village demonstrated credibly that it used those procedures in an attempt to help Thiel and give her guidance. In the face of deficient performance, the Village understandably wanted to test Thiel in order to discover whether she had the necessary skills to be an officer. Such procedures were not uncalled for; as police competence is vital to public safety, it is of ultimate importance that officers are carefully monitored for ability and appropriate responses. Indeed, Thiel did manifest difficulty in accepting and executing orders and directives of her superior officers. Accepting "tip-offs" from fellow officers and a willingness to chat with fellow officers about real or perceived difficulties with superiors, from the Department's point of view, work against discipline, respect for authority and quick positive reaction under demanding circumstances. Thiel neglected to submit evidence that similarly-situated male probationary officers were not subject to the business card and daily report procedures. Thiel did not prove herself to have the necessary abili-

ties in various fields of performance, such as knowledge of city streets, obeying traffic laws, controlling arrest situations. The record and testimony demonstrate that she did not respond appropriately to orders or authority, and that she was not proactive in her approach to her work. She never complained about or discussed with her superiors any of the negative evaluations. Her own demeanor on the witness stand demonstrated the apathy and passivity complained of by her superiors. As such, the court finds that the business card procedure and daily progress reports were not part of any Title VII violation.

### IV. VERDICT

In sum, the court finds that Thiel did not establish a Title VII violation based on her gender, and that the Village established genuine non-discriminatory reasons for terminating Thiel. The court is not at all convinced that the Department fired Thiel because of her sex rather than because of her failure to perform and to appropriately interact with her superiors.

The court notes that the Department could fire probationary officers for any reason, or for no reason at all. Of course, that proposition is limited by the caveat that probationary officers cannot be fired for reasons prohibited by law, such as "because of sex." Unless Thiel could show that she was fired because of her sex, she could not prevail in the instant gender discrimination case, no matter how "unfair" the reasons for her termination may be. Thiel failed to offer sufficient testimony or documentary evidence from which the court could infer that she was fired because of her sex, or that she was sexually harassed. Consequently, the court finds that the Village is not liable for gender discrimination or sexual harassment.

IT IS SO ORDERED.