Donna LESON, Plaintiff,

v.

**ARI OF CONNECTICUT, INC., Defendant.**

**No. 3:97CV02533 (WWE).**

United States District Court,
D. Connecticut.

April 30, 1999.

---

136

Stephen P. Horner, Stephen P. Horner & Assoc., Norwalk, CT, for plaintiff.

Michael J. Soltis, Francis P. Alvarez, Maureen Ann Bresnan, Jackson, Lewis, Schnitzler & Krupman, Stamford, CT, for defendant.

## RULING ON MOTION FOR SUMMARY JUDGMENT

EGINTON, Senior District Judge.

### INTRODUCTION

This is an action brought by plaintiff Donna Leson ("Leson") against her former employer, defendant ARI of Connecticut, Inc. ("ARI") to redress injury allegedly done to her by ARI's discriminatory treatment on the basis of sex and retaliation, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. The complaint contains two other causes of action: violation of the Connecticut Fair Employment Practices Act, Conn.Gen.Stat. § 46a–60 et seq. and negligent infliction of emotional distress. ARI has moved for summary judgment on all counts of the complaint.

### STATEMENT OF FACTS

The Court's statement of facts is culled from the parties' Local Rule 9(c) Statements, as very few of the facts therein are disputed.

ARI is a not-for-profit agency which provides services to individuals with mental retardation. The agency provides an array of residential, recreational, vocational and supportive services to disabled individuals and their families. As part of the services it provides, ARI assists the people it serves in establishing and maintaining independent living situations. Some persons served by ARI live in ARI "group homes" with other persons served. Others served by ARI, who are capable of living more independently, live in apartments in the community.

At all relevant times Dan Rosen ("Rosen") was the President and CEO of ARI. Leson had a good working relationship with Rosen.

ARI has submitted substantial evidence that one Warren Gross ("Gross") was an outside contractor, who performed coaching and training sessions at ARI beginning in 1989. Gross was never an employee of ARI. Although Leson asserts that Gross was an employee/agent of ARI, the materials filed by ARI support fully its contentions of Gross's role at ARI.

Leson was first hired by ARI in July, 1985, as a Residential Counselor. She was later promoted to the position as Coordinator of the Palermo Group Home.

In December, 1991, ARI hired one Marty Brault ("Brault") as Residential Manager. In this position, Brault was Leson's supervisor. Beginning in June, 1993, and continuing through April or May, 1995, Leson and Brault had a romantic relationship.

In October, 1992, ARI again promoted Leson to a second Residential Manager position. Rick Chamiec–Case ("Case") was Leson's supervisor in this position. As Resident Managers, both Brault and Leson reported to Case. Case and Leson were very close friends; in fact, Leson is the godmother to Case's daughter.

Beginning in 1993, while she was Manager of Residential Services, Leson attended weekly supervisory training meetings directed by Gross. In most instances, Brault was the only other person to attend these one-half hour sessions, as participation was voluntary. No one in ARI management was penalized in any manner for not attending these sessions.

Leson complains of Gross's conduct at these sessions, as follows:

a) On occasion Gross may have called her "love", "sweetie" or "honey". He did not use these terms at every session. Gross never asked Leson out on a date or indicated that he wanted to have a sexual relationship with her.

b) In 1994, it was known at ARI that Leson was getting a divorce. Leson alleges that during that time, Gross told her that her ex-husband must be crazy. Leson testified that she believed this comment was "loaded with innuendo of what I look like."

c) One Steve Haley ("Haley"), a subordinate of Leson, often went to her home to help her out with projects. Although Haley apparently told some co-workers that he was having a sexual relationship with Leson, it appears from the moving papers that such was not the case. Leson alleges that Gross told her that Haley saw her as a "motherly figure".

d) Gross, Brault and Leson participated in a training session which included a scenario where two male employees were in love with one female employee.

e) While speaking to her at a session, Gross touched her knees, forearms, head and shoulders.

In November 1995, ARI required its management to attend a sexual harassment prevention training session. Outside contractors, such as Gross, were also invited to attend. At some point after the November, 1995, sexual harassment training Leson attended another weekly supervisory meeting with Gross. At that meeting, Leson asked Gross to stop calling her "love", "honey" and/or "sweetheart" and to stop touching her. Gross never did either again. He did, however, tell her that if she was going to be so sensitive, at some point in time she would "hit a glass ceiling" at ARI.

Leson went with Brault from this session to the office of Amy Santoro, Manager of Human Resources, to advise her of the "glass ceiling" remark and what was behind such a comment. Santoro reported the conversation to Rosen. Leson allegedly also told Case about the conversation.

Following these conversations, Leson alleges that she was retaliated against in the following manner:

a) Case called Leson into his office to discuss complaints that other employees had made about Leson's work performance.[1]

b) Leson was questioned by Rosen and Case about her relationship with Haley. One week after the sexual harassment training session, one Pam Harris, a nurse for ARI, told Rosen that she believed that ARI was in jeopardy of being accused of sexual harassment by Haley if he were terminated because of Leson's relationship with him. Although this is averred to in affidavits and deposition testimony submitted by defendant, Leson maintains that the complaint was made by Gross, not Harris.

c) On March 11, 1996, Case told Leson and Brault that ARI had determined to restructure Residential Services, as it had the Day Program, and had decided that

---

1. Leson was not disciplined any way as a     result of this meeting.

Brault would be the Manager of Residential Services with overall responsibility for all Residential Services. Leson would be Area Head of Supported Living, which included the apartment program, ARI's fastest growing program. Leson would continue at her same salary and benefits in her new position, in which she would answer to Brault. Leson saw this as a retaliatory demotion of herself.

Accordingly, Leson told Case that she intended to resign. Case asked her not to; however, Leson prepared a letter of resignation. Leson did not make inquiry as to how her responsibilities would change in this new position. She simply told ARI that she would not accept it.

Leson asked for a "pink slip" indicating that her position had been eliminated. ARI told her that it was not demoting her, not laying her off, not terminating her, and ARI had a position for her at ARI with the same pay and benefits, doing substantially the same work in the very important and fast growing apartment program. Under these circumstances, ARI refused to give her a "pink slip".

The restructuring took effect on April 8, 1996. Leson reported to work until that date but refused to do so on or after that date. She collected unemployment benefits from April to September, 1996. After she left ARI, Leson testified that she undertook a "half hearted" job search, which search consisted of (1) sending a resume with no cover letter to an agency similar to ARI; (2) speaking with an agency that provided in-home services; and (3) calling, but otherwise not pursuing, some positions advertised in the newspaper. She testified that she did not pursue jobs that paid under $15.00 per hour.

## LEGAL ANALYSIS

### I. *The Standard of Review*

In a motion for summary judgment the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. Fed. R.C.V.P. 56(c). See also *Anderson v. Liberty Lobby*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23, 106 S.Ct. 2548. Accord, *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir.1995) (movant's burden satisfied by showing if he can point to an absence of evidence to support an essential element of nonmoving party's claim).

The court is mandated to "resolve all ambiguities and draw all inferences in favor of the nonmoving party...." *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.), *cert. denied*, 506 U.S. 965, 113 S.Ct. 440, 121 L.Ed.2d 359 (1992). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). If the nonmoving party submits evidence which is "merely colorable", or is not "significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505.

Summary judgment is also appropriate in employment discrimination cases even though such cases may often turn on the issue of an employer's state of mind or intent. The "summary judgment rule would be rendered sterile ... if the mere

incantation of intent of state of mind would operate as a talisman to defeat an otherwise valid motion." *McCloskey v. Union Carbide Corp.*, 815 F.Supp. 78, 80 (D.Conn. 1993), *quoting Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985). Absent a triable issue of fact as to discrimination, summary judgment for the defendant is appropriate. *Raskin v. The Wyatt Company*, 125 F.3d 55, 64 (2d Cir.1997) (affirming summary judgment in ADEA case where employee failed to make sufficient showing of discrimination).

## II. *The Standard As Applied*

### 1) **Whether the Majority of Leson's Claims Are Time–Barred**

Title VII requires a claimant to file a discrimination charge with Equal Employment Opportunity Commission within 180 days of the alleged unlawful employment action or, if the claimant has already filed the charge with a state of local equal employment agency, within 300 days of the alleged act of discrimination. 42 U.S.C. § 2000e–5(e)(1). An exception to this is a so-called "continuing violation" which provides that if a plaintiff files an EEOC charge as to any incident of alleged discrimination in furtherance of an ongoing policy of discrimination, all claims or acts of discrimination under that policy will be timely even if they had been untimely standing alone. ARI argues that such exception is not available to Leson and that the only incidents which may be examined are those falling between November 9 and November 28, 1995 because those are the only incidents falling within the 300 day Title VII statute of limitations. Leson, in turn, asserts that the persistent pattern of harassing behavior by Gross brings her within the continuing violation exception. *See Riedinger v. D'Amicantino*, 974 F.Supp. 322, 326 (S.D.N.Y.1997) and cases cited therein.

Although the Court believes this to be a close issue, it must look at the evidence in the light most favorable to plaintiff as the non-moving party and, accordingly, holds that Leson's claims are timely.

### 2) **Whether Gross Sexually Harassed Leson**

In 1998, noting that the federal courts were being inundated with sexual harassment cases, the United States Supreme Court decided the seminal case of *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662. This case set forth what cases are actionable as true sexual harassment cases, as opposed to those which are not. "To be actionable ..., a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Id.* at 2283. To determine whether an environment is sufficiently hostile or abusive, a court must look "at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* "These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.' Properly applied, they will filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing'. We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment." *Id.* at 2284.

■ Applying these principles to Gross's conduct results in a clear conclusion—that his conduct does not meet that defined as true sexual harassment worthy of Title VII protection. Reviewing the conduct individually or as a whole makes no difference, for no reasonable person would find such conduct hostile or abusive.

a) Frequency. Leson met with Gross *voluntarily* once a week for one-half an

hour. She testified that she was unsure if he made the objectionable comments or touched her at every training session. When she advised him to stop such conduct, he immediately did.

b) Severity. Leson does not allege that Gross's conduct was severe. To the contrary, she describes it as "inappropriate, offensive and unwelcome."

■ c) Physical threatening or humiliating or a mere offensive utterance. Leson testified that she was not physically threatened by Gross's conduct. Rather, she testified that his conduct was merely rude and insensitive. Brault, who had a romantic relationship with Leson and was usually in the training sessions with Leson and Gross, has averred that Gross only touched Leson above the table in a manner similar to how Gross touched Brault.[2]

The Court also finds that the "ex-husband" and/or "motherly figure" statements fall far short of the conduct condemned by Title VII. On their face, neither was severe, each was made just once, and neither is remotely physically threatening or humiliating. No reasonable person would find either remark to be hostile, abusive or extreme. *Faragher*, 118 S.Ct. at 2283–84. The same is true of the training session involving two male employees being in love with one female employee. Leson did not offer any evidence in her deposition testimony that there was anything sexually offensive to her about this scenario.

Several Courts of Appeal, examining conduct similar to or more offensive than Gross's conduct have either affirmed summary judgments or directed verdicts. *See, e.g., Hartsell v. Duplex Products*, 123 F.3d 766 (4th Cir.1997) (upholding summary judgment for employer on Title VII claim based on comments such as "we've made every female in this office cry like a baby" and "why don't we have sales associates that look like that?" upon seeing a picture of a buxom female in a low cut T-shirt); *Baskerville v. Culligan Intern. Co.*, 50 F.3d 428, 430–31 (7th Cir.1995) (comments such as calling plaintiff "pretty girl" and that "all pretty girls run around naked" and simulating masturbation had sexual charge of an Abbott and Costello movie and were manifestation of an adolescent, silly man). The district courts have agreed with such analyses. *See, e.g., Stacy v. Shoney's, Inc.*, 955 F.Supp. 751 (E.D.Ky. 1997) (granting summary judgment for employer where plaintiff alleged, among other things, that supervisor made daily comments about her appearance, leered at her and once touched her breast with his fist and slid a pen up and down her breast pocket); *Thiel v. Village of Libertyville*, 947 F.Supp. 377 (N.D.Ill.1996) (no sexual harassment when supervisor called plaintiff "sweetheart", patted her on the head and referred to her by an extremely vulgar name on one occasion).

Based on these controlling and persuasive precedents, the inquiry as to whether Gross sexually harassed Leson must be answered in the negative.[3]

### 3) Whether Leson's Claims of Retaliation are Viable

In Counts Two and Three, Leson alleges unlawful retaliation in violation of Title VII and the Connecticut Fair Employment Practices Act. Since Connecticut courts look to federal employment discrimination

---

**2.** This statement is, in itself, sufficient in part to defeat Leson's sexual discrimination claim. "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions to which members of the other sex are not exposed." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 25, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (Ginsberg, J., concurring). Inasmuch as Brault has submitted a sworn statement that Gross touched him in the same manner as Leson, she was not exposed to any disadvantageous condition which differed from a male employee.

**3.** Inasmuch as the Court has determined that Gross did not sexually harass Leson, a *fortiori*, ARI may not be deemed negligent with regard to Leson's complaints of Gross's conduct.

law for guidance in enforcing their state anti-discrimination statutes, both counts will be analyzed under the same theories of law. *See State of Connecticut v. Commission of Human Rights and Opportunities,* 211 Conn. 464, 470, 559 A.2d 1120 (1989).

In order to prove a prima facie case of discriminatory retaliation, an employee must show (1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action. *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 769 (2d Cir.1998).

Taking the facts in the light most favorable to Leson, the Court finds that she has succeeded in meeting the first element of a prima facie case, *i.e.,* Rosen knew of her complaints of sexual harassment against Gross when he made the decision to give Brault the Manager of Residential Services position, which decision Leson alleges was in retaliation for her complaints about Gross.

Leson cannot, however, meet the second element of her prima facie case because she suffered no employment action disadvantaging her. The United States Supreme Court discussed the concept of tangible employment actions in both of its 1998 cases on the matter. *See Burlington Indus. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) and *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). In *Burlington,* the Supreme Court stated that:

> A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. . . . A tangible employment action in most cases inflicts direct economic harm.

*Burlington,* 118 S.Ct. at 2268.

An adverse employment action is not every action that the employee dislikes or disagrees with. Rather, a reasonable person must view the decision as adverse. *Doe v. Dekalb County School District,* 145 F.3d 1441, 1449 (11th Cir.1998).

In the present case, Leson was offered a position with the identical pay and benefits. Accordingly, she suffered no economic harm. She was told repeatedly by her supervisor that the new position was not a demotion, yet she testified that she never even asked about her specific job duties after the restructuring. While it is true that Leson would lose responsibility for one group home, she would have retained control over the entire apartment program, the fastest growing ARI program. As she already had responsibility for a portion of the apartment program, this new job did not have significantly different responsibilities. Leson's belief that she had suffered an adverse employment decision is her own subjective surmise. Objectively, no reasonable person would believe that she had suffered such within the mandate of *Burlington.*

Inasmuch as Leson cannot meet the hurdle of this element of her prima facie case, the inquiry ends here and Leson's claim of retaliation, under both federal and state law, necessarily fails.

### 4) Whether Leson Has a Valid Claim for Negligent Infliction of Emotional Distress.

The Connecticut Supreme Court has held that in order to establish a claim for negligent infliction of emotional distress, a plaintiff must allege unreasonable conduct during the termination process, not merely wrongful termination. *Parsons v. United Technologies Corp.,* 243 Conn. 66, 88, 700 A.2d 655 (1997).

> Negligent infliction of emotional distress in the employment context arises only where it is "based upon unreasonable conduct of the defendant in the termination process." *Morris . v. Hartford*

*Courant Co.*, 200 Conn. 676, 683, 513 A.2d 66 (1986). The mere termination of employment, even where it is wrongful, is therefore not, by itself, enough to sustain a claim for negligent infliction of emotional distress. "The mere act of firing an employee, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior." *Madani v. Kendall Ford, Inc.*, 312 Or. 198, 204, 818 P.2d 930 (1991). *Parsons v. United Technologies Corp.*, 243 Conn. at 88–89, 700 A.2d 655.

Several other post *Parsons* cases decided by the district courts establish that there must be evidence that the termination was conducted in a humiliating or other unreasonable manner. *See, e.g., Sacco v. George Schmitt & Co.*, 3:97–CV–2180 (D.Conn. Sept. 14 1998) (dismissal of claim, holding that plaintiff had not proven that he had been terminated in an inconsiderate, humiliating or embarrassing manner); *Thomas v. Saint Francis Hospital and Medical Center*, 990 F.Supp. 81 (D.Conn.1998) (claim dismissed where plaintiff produced no evidence that defendant acted unreasonably in termination).

The law in Connecticut is well established: Leson must prove that the termination of her employment by ARI was done in an inconsiderate, humiliating or embarrassing manner. Even viewing the facts in the light most favorable to Leson, she cannot meet this test. The critical reason is that, objectively, Leson was not terminated in any manner, let alone in that manner established by *Parsons* and its progeny. Leson **voluntarily resigned,** despite ARI's continued attempts to dissuade her from this decision. She was advised many times by many people that this was not a demotion in any way. The announcement of the restructuring and the promotion of Brault was conducted in a highly professional manner. She was to receive the identical pay and identical benefits in her new position. She testified that she did not even ask exactly what her new duties would be; instead, she simply failed to show up for work on the day the restructuring went into place and never went back to ARI again. The evidence is irrefutable and Leson's claim for negligent infliction of emotional distress must also fail.

### 5) Whether Leson was Constructively Discharged

Leson alleges that the 1996 restructuring resulted in her being constructively discharged. "Constructive discharge of an employee occurs when an employer, rather than directly discharging an employee, intentionally creates an intolerable work atmosphere that forces and employee to quit voluntarily. Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Chertkova v. Connecticut General Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir.1996). A plaintiff cannot claim a constructive discharge where there was no more than a change in job responsibilities, based on a reasonable business decision on the part of the employer. *Lombardo v. Oppenheimer*, 701 F.Supp. 29, 31 (D.Conn.1987) (transfer to a monotonous and demeaning job with less responsibilities and cold treatment from superiors insufficient to support claim of constructive discharge).

To plead a prima facie case of constructive discharge, a plaintiff must allege two elements. First, the plaintiff must show that the defendant acted deliberately to create an intolerable work environment. "Deliberateness exists only if the actions complained of were intended by the employer as an effort to force the employee to quit." *Lombardo*, 701 F.Supp. at 30.

The second element requires that the working conditions be intolerable. Intolerability is measured by a reasonable person standard and not by the employee's subjective feelings. *Lombardo*, 701 F.Supp. at 30–31. "An employee's subjec-

tive opinion that her working conditions are intolerable is not sufficient to establish constructive discharge." *Pena v. Brattle-boro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983) (no constructive discharge when employer made it clear it wished employee to remain as employee and there was no loss of pay in new position). Mere reduction or change in job responsibility does not constitute constructive discharge. *See Pena*, 702 F.2d at 325–26.

As can be gleaned from these cases, the standard for constructive discharge is "indeed a demanding one." *Martin v. Citibank*, 762 F.2d 212, 221 (2d Cir.1985) (resignation due to humiliation over employer's loud mention of polygraph test and over burdensome working conditions does not amount to constructive discharge).

■ Leson bases her claim of constructive discharge on the 1996 restructuring. Inasmuch as Leson did not work even for one day in her new position, it is impossible for her to prove that the working conditions were intolerable or that ARI deliberately set about to force her to quit. "A reasonable person will usually explore alternative avenues thoroughly before coming to the conclusion that resignation is the only option." *Larkin v. Town of West Hartford*, 891 F.Supp. 719, 728 (D.Conn.1995). In the present case, Leson was asked by management time and again not to resign. She admitted in her deposition that she did not even inquire as to what her new working conditions would be. A constructive discharge generally cannot be established simply through evidence that an employee was dissatisfied with the nature of her assignments. *Stetson v. NYNEX Service Co.*, 995 F.2d 355, 360 (2d Cir.1993).

In sum, applying these stringent standards, Leson's claim of constructive discharge is without merit.

### CONCLUSION

Even after construing each of Leson's claims in her favor, as a matter of law she has provided this Court with no evidence that she has presented any genuine issues of material fact to be tried to a fact finder. Summary judgment is GRANTED in ARI's favor on all counts of the complaint [Doc. No. 34]. The Clerk is directed to close this case and enter judgment for defendant.

SO ORDERED.