Jane SEDOTTO, Plaintiff,

v.

BORG–WARNER PROTECTIVE SERVICES CORPORATION d/b/a Burns International Security Services, Defendant.

No. 3:98CV1672 GLG.

United States District Court,
D. Connecticut.

May 8, 2000.

Margaret J. Slez, Anthony F. Slez, Jr., Carron & Fink, Westport, CT, for Plaintiff.

## OPINION

GOETTEL, District Judge.

Plaintiff, Jane Sedotto, has brought this employment discrimination suit pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, ("Title VII"), the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*, ("ADEA"), the Fair Labor Standards Act of 1938, as amended by the Equal Pay Act of 1963, 29 U.S.C. § 203 ("EPA"), and Connecticut's Fair Employment Practices Act, C.G.S.A. § 46a–60(a) *et seq.* ("CFE-PA"). Plaintiff alleges that her employer, Borg–Warner Protective Services Corporation, d/b/a Burns International Security Services ("Burns") discriminated against her on the basis of her age and gender, that she was subjected to unlawful harassment on the basis of her age and gender, that she was denied equal pay, and that Burns unlawfully retaliated against her for complaining of the harassment and unequal treatment. Defendant has moved for summary judgment on all counts of plaintiff's complaint [**Doc. # 22**].

### THE SUMMARY JUDGMENT STANDARD

Summary judgment "shall be rendered forthwith" if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). A genuine issue of materi-

al fact exists if, based upon the evidence of record, a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the burden of showing that there exist no genuine factual issues to be tried. *See Gallo v. Prudential Residential Servs., Ltd. Partnership*, 22 F.3d 1219, 1223 (2d Cir.1994). In assessing the record to determine if such issues do exist, all ambiguities must be resolved and all inferences must be drawn in favor of the party against whom summary judgment is sought. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. In employment discrimination cases, the Second Circuit has cautioned that district courts "must be cautious about granting summary judgment to an employer when ... its intent is at issue," *Gallo*, 22 F.3d at 1224, which, of course, is usually the case.

## FACTUAL BACKGROUND

Because this matter comes before the Court on defendant's summary judgment motion, we present the facts in the light most favorable to the plaintiff.

Defendant Burns International Security Services is in the business of providing security services to clients around the world. The Company is divided into regional business units headed by a business unit president. The business units are further divided into districts headed by a district manager, who reports to the business unit president.

Plaintiff is a female and at all times relevant to her complaint was over the age of 40 years. She was hired by Burns on June 20, 1988. After three months of training, during which time she held the title of Quality Assurance Manager, plaintiff was promoted to District Manager of the Farmingville District. Several months later, she was promoted to District Manager of the Hartford District, a larger and more lucrative district. Plaintiff remained in charge of the Hartford District for the remainder of her employment with Burns. In 1995, her title was changed to General Manager but her job remained the same.

The Hartford District is part of the Northeast Business Unit, which included districts managed by fourteen male managers and two female managers. In mid–1993, Jack Donohue became president of the Northeast Business Unit and as such became plaintiff's boss. Many of plaintiff's complaints relate to the difficulties she experienced with Donohue. Plaintiff alleges generally that, under Donohue's supervision, she was denied promotional opportunities that were offered to males and that she was forced to endure a hostile work environment, in which she was subjected to sexually harassing language and conduct that was intended to demean and insult women in general and plaintiff in particular. Plaintiff describes Donohue as very charming at times and extremely sarcastic and abrasive other times. She states, however, that he was this way with everyone and admits that he never made any sexual remarks to her nor made any comments about her age. (Pl.'s dep. at 87).

Plaintiff cites to the following specific incidents in support of her claims of discrimination.

Shortly after Donohue's appointment, plaintiff took a two-week vacation. When she returned, Donohue told her that she would not be permitted to take a two-week vacation in the future, a restriction that she claims was not placed on male managers. Defendant admits that there were male managers who were permitted to take two-week vacations, but that they did not encounter problems in their districts while they were gone, whereas plaintiff admittedly did have problems in her district during her absence. In December 1993, Donohue berated plaintiff again concerning her two-week vacation and called her "incompetent."

Plaintiff states that, in 1995, she was asked to help out in the Westchester District Office because of problems it was experiencing, and she expressed an interest in managing the Westchester Office as a second office (something she alleges

male managers had been allowed to do). Donohue never responded to this request.

In May, 1995, while plaintiff was at the Westchester Office, the male manager of that office, Mr. Kalle, made comments about plaintiff's breasts in front of her and other male office staff. (Pl.'s Compl. ¶ 14). She states that Kalle "turned up the air-conditioning to cause a physical reaction in plaintiff's anatomy, thereby prompting further humiliating and offensive comments" by him in front of the staff. *Id.* Kalle would say, "Oh, you have your headlights on," to which plaintiff responded that this was a horrible thing to say and walked out of the room. (Pl.'s Dep. at 138). Plaintiff states that she is sure this occurred more than one time, because after she talked to Kalle, "he thought it incumbent to do it again." *Id.* Plaintiff reported this conduct to defendant's Human Resources Manager, Ilene Hauer, who, according to plaintiff, responded that this conduct was a "power trip" not sexually motivated. (Pl.'s Compl. ¶ 15). Plaintiff states that she was so embarrassed by what transpired in the Westchester Office that she no longer wanted to work there. "After some time, [she] reported to Donohue that her continued presence at the Westchester office would be unproductive and [she] returned to defendant Burns' Hartford office." *Id.* at ¶ 18. Within a few months Kalle was transferred from the Westchester Office, and Charles Costello, Burns' 1994 Manager of the Year from Albany, New York, was given this position.

In July, 1995, Donohue allegedly told plaintiff again that she was incompetent and that she should resign.

In November, 1995, plaintiff left work early because of a snow storm. Donohue called her at home and screamed at her for leaving work early because of the storm.

Plaintiff also complains about defendant's promoting Tom Hauck to the position of Vice President of Sales on December 12, 1995. Hauck was younger than plaintiff. She states that she held a position equivalent to his and that no notice had been posted that this position was open to District Managers. Plaintiff complained of the lack of posting to Ilene Hauer, who responded that she herself had been passed over for a promotion in favor of a male employee. Defendant responds that it never followed a policy of posting available positions before filling them.

Plaintiff states that shortly after Hauck's promotion, Hauck attempted to reach plaintiff by telephone several times, and when he finally spoke to her, he accused her of never returning his calls. He stated that "everyone knows that you are never there." *Id.* at ¶ 31. Plaintiff states that she had no obligation to report her work schedule to Hauck.

In January 1996, all managers attended a series of meetings to introduce the new vice presidents. At one of the meetings, John O'Brien, the CEO of Borg–Warner Security (defendant's parent company) and former vice president of Human Resources, started the meeting by telling an inappropriate joke purporting to show the difference between men and women. Although the mostly male audience clearly appreciated the joke, Linda McDonnell (the other female manager in the Northeast Business Unit) and plaintiff did not and expressed their discomfort to Ilene Hauer. Hauer agreed that the joke was inappropriate but pointed out that it was the CEO of Borg–Warner who had told it.[1]

In February of 1996, Donohue visited the Hartford office for a meeting with the sales force, which did not involve plaintiff. Prior to the meeting, he came into plaintiff's office and berated her concerning her poor job performance. Plaintiff became very upset. She states that as Donohue left he smiled and said to her, "I keep the AMA [the American Medical Association] in business." (Pl.'s dep. at 66). Plaintiff testified that Donohue did not say anything of a sexual nature to her or about

---

1. We do not have sworn testimony from the plaintiff concerning this incident but it is cited in plaintiff's opposition papers and we have the sworn statement of Linda McDonnell about the incident, which indicates that plaintiff was present when this occurred.

her age, but that she felt he had gone "over the line" with his remark about the AMA, and she started looking for a new job. (Pl's dep. at 66 & 98).

On September 17, 1996, plaintiff attended a training class on sexual harassment in the workplace run by defendant's Human Resources' staff. At the training class, one of the male attendees [2] remarked to the four women and eight to ten men who were present that women have no place in the security business and that "they are nothing but problems because they have children and have monthly health problems." (Pl.'s Compl. ¶ 33). Plaintiff was embarrassed by this statement and was the only one that objected.

On October 7, 1996, Jeff Driesen, Vice President of Operations, called plaintiff about a problem that she had reported with a male manager of another office. Plaintiff stated that the male manager had not told the truth. Driesen referred to plaintiff as a "liar" and stated that he knew the other "gentleman" would not lie. *Id.* at ¶ 34.

On October 16, 1996, plaintiff attended a meeting with the other district managers to discuss financial goals for the remainder of the year. One of the managers stated that the goals could be met because they were "all grown men." *Id.* at ¶ 34. When plaintiff objected to this remark, she claims that she became the object of sneers and jokes, including one man's commenting "then go get us some fresh coffee." *Id.* At this same meeting, the planned evening activities were poker and cigar parties. When plaintiff and the other women managers complained that they did not play poker or smoke cigars, the general response was to the effect that if they wanted to be equal to men and run with the big boys, then they would have to play with them.

Plaintiff also alleges that between June 1995 and June 1997, three male district managers (including Hauck, discussed above), whom she claims had poor performance records and less tenure than she,[3] were promoted by defendant without any prior notice that these positions were available to plaintiff or anyone else. In her deposition, however, plaintiff admitted that she did not know the qualifications required for any of these three positions and that she could not state whether she was better or less qualified for these positions than the persons who were selected. (Pl.'s dep. at 61). Her primary complaint was that she had not been made aware of the openings through posting of the vacancies or otherwise.[4] *Id.* at 62.

**2.** Plaintiff's complaint seems to indicate that this individual was a manager with Burns. However, in her deposition, plaintiff indicated that he was from Wells Fargo, another company that had sent representatives to this meeting. (Pl.'s dep. at 149). She states that Ilene Hauer and another woman "who worked out of corporate" were running the meeting and, after this statement was made, they "just got very quiet. They didn't tell this guy to shut up and I did..... I told him that his comments are very inappropriate. I asked him what cave he came out of." *Id.* at 149–50.

**3.** Defendant disagrees with this assertion and states that the three promoted were better qualified than plaintiff. Defendant states that Hauck, who received the first promotion of which plaintiff complains, was promoted from General Manager to Vice President of Sales for the Northeast Business Unit because of his extensive sales experience and because he had been an extremely successful salesman while at Burns. Plaintiff, by contrast, had a poor growth record at Hartford and had never expressed any interest in sales.

Jeff Driesen was promoted in April 1996 from General Manager to Vice President of Operations. Driesen had been with Burns longer than plaintiff and had prior experience as an executive vice president of a shipping company. He had achieved higher growth for his district than plaintiff had achieved in her Hartford district.

In January 1997, Bob Marone was made Director of Client Services for the Northeast Business Unit. He had previously been a General Manager but his office was eliminated during a corporate restructuring. As Director of Client Services, Marone earned less than plaintiff. Thus, defendant questioned whether plaintiff would have considered this a "promotion" and been interested in this position.

**4.** Plaintiff testified:

What the company failed to do, in my opinion, is say, "yes, we have jobs open. They

In January 1997, plaintiff asked Donohue why she had not been made aware of these opportunities for promotion, to which he responded that she had been offered larger districts in North Carolina and Florida, which she declined. Plaintiff admits that it was not unreasonable for Donohue to suggest these possibilities since plaintiff had told him that she might be interested in North Carolina where her daughter lives, and Florida where she might retire someday. *Id.* at 104. Nevertheless, plaintiff states that these were not promotions but lateral transfers.

At this same meeting, plaintiff also questioned why she had not received a salary increase since March 1995. Shortly thereafter, she received a 1% increase. Upon discussing this raise with other male managers, "plaintiff was led to believe that they had received annual and more substantial salary increases." (Pl.'s Compl. ¶ 42). Plaintiff admits that she had no knowledge of the criteria for pay increases (although apparently she had received a pay increase in March of 1995). Defendant states that district manager pay was tied to district size, business revenue growth, and the extent to which a district manager met his or her goals. Defendant denies that salary was based on gender. Defendant's current Director of Human Resources, Christine Hirschl, testified by affidavit that the 1% pay increase that plaintiff received in 1996 was larger than the pay increases given to six of the male General Managers in the Northeast Business Unit. Additionally, according to Hirschl, plaintiff's overall performance rating in 1996 was a "3" on a one-to-five scale. Although she received a pay increase, no male manager receiving a 3 or worse received any increase at all. Further, at the time of her increase, plaintiff was already making the same or more than half of the male managers in her Business Unit (although neither plaintiff nor defendant has provided us with any relevant information as their relative experience and seniority

as compared to plaintiff, whether they had met their performance goals, the size and revenues of their districts, or any other factors that could be used for a meaningful comparison of their salaries with that of the plaintiff).

Plaintiff further alleges that in January of 1997, she requested assistance from Donohue with her largest account. Despite Donohue's "usual practice of assisting male-run offices with smaller account problems," he did not respond to plaintiff's request. (Pl.'s Compl. ¶ 45).

In early February, 1997, plaintiff was working with two male employees on a presentation report for a large account. She claims that they caused the report to have erroneous information in it (although it appears that the error—a lower than accurate turnover rate for the Hartford Office—would have worked in plaintiff's favor). She states that following the presentation, she had lunch with Donohue, Ilene Hauer, the director of Human Resources, and Hauck the Vice President of Sales. During lunch, Hauck repeatedly made demeaning remarks to plaintiff and made orgasm the subject of conversation. Plaintiff was embarrassed but was afraid to say anything.

In February, 1997, Donohue informed plaintiff that he was considering transferring her to the Westchester District, which she had asked for in 1995, but which had lost most of its business in the intervening two years. Plaintiff states that this would have been a demotion since her Hartford district was performing so well and base salary was determined by a district's performance. She asked if she could keep her Hartford District in addition to Westchester and was told that she could not. Donohue indicated that, if she transferred to Westchester, he was considering putting Terrence McGrath, a young male, in charge of Stamford and Hartford. Plaintiff alleges that only males were put in

---

are open to everyone in the business unit, in the company, the world, whatever. And these are the qualifications, not to fill them

in some back room and not give anybody the opportunity to put in for them."
(Pl.'s dep. at 62).

charge of two districts, an opportunity denied to plaintiff.

On February 25, 1997, plaintiff attended a meeting with approximately 40 other managers and sales representatives, of which only six were female. At the meeting the Vice President of Sales, Jim Flavin, pointed to his groin and referred to it as "low hanging fruit." Plaintiff was extremely embarrassed.

On March 10, 1997, plaintiff sent her notice of resignation to Donohue. Her resignation was effective April 4, 1997. She was replaced by a younger male as Manager of the Hartford District. Plaintiff testified that, at the time she resigned, she was on target in terms of meeting her production goals for 1997. Defendant concurs that her performance was good and she would have met all of her goals had she not resigned. Plaintiff received a bonus of $11,000 in 1997, over and above her $51,000 salary.

Plaintiff states that by late 1996/early 1997, she knew that she "could not take the atmosphere and treatment at Burns much longer," but, because she was "neither a wealthy nor a foolish woman," she waited until she had found another job before resigning from Burns. (Pl.'s Aff. ¶ 8). Plaintiff received a job offer from StaffPLUS. She thought the new job was an extremely good opportunity for her and admits that she would have stayed at Burns if this job had not come along. (Pl.'s dep. at 77). Shortly after plaintiff went to work for StaffPLUS, however, a dispute arose between her and her new employer about the hours she was required to work and she was fired. Defendant has produced a demand letter written by plaintiff's counsel to StaffPLUS, which indicates that plaintiff "would not have quit her job" with Burns if she had known of the hours StaffPLUS required her to work and further that plaintiff "voluntarily left her previous job without knowing that employment by StaffPLUS would be **conditioned** upon her working 47.5 hours a week as an 'exempt' employee." (Letter from Attorney Slez to Susan Durnwirth,

President of StaffPLUS, dated June 3, 1997) (emphasis in original).

Plaintiff claims that the events described in her complaint are the result of a policy of discrimination on the part of defendant, and cites to an employment discrimination complaint filed by Linda McDonnell, the only other female district manager in the Northeast Business Unit, charging Burns with denying her promotional opportunities, disrespect, and unequal treatment, and sexual harassment. In her sworn affidavit, McDonnell cites to several of the same incidents recited above (the promotions of Hauer and Driesen, and the October 1996 meeting) and supports plaintiff's version of the facts. She alleges that the acts against her occurred from 1993 through January 1997, when she was forced to resign. She also cites to incidents not mentioned by plaintiff, some of which are relevant to plaintiff's hostile environment claim. These include an incident in May of 1994 at a mandatory Business Unit meeting when the Regional Vice President, Russ Kelly, called McDonnell "legs" in front of several other managers, and a sales manager from another district followed her into the ladies room and tried to kiss her. McDonnell immediately told plaintiff about these incidents, as plaintiff was the only other female manager at the meeting. McDonnell states that despite her complaints concerning these incidents, no effective action was taken to prevent a recurrence.

On June 30, 1997, plaintiff dual-filed a charge of discrimination with the Connecticut Commission on Human Rights and Opportunities ("CCHRO") and the Equal Employment Opportunity Commission ("EEOC"). After receiving a right to sue letter, plaintiff instituted this action.

### DISCUSSION

Plaintiff's employment discrimination claims can be categorized as follows: constructive discharge because of her age and gender; failure to promote because of her age and gender; hostile work environment

caused by age and gender-based harassment; denial of equal pay; and retaliation.

### I. Constructive Discharge Based on Gender and Age

■ To establish a *prima facie* case of age or gender discrimination, plaintiff must show (1) that she is a member of a protected class, (2) that she was qualified for the position, (3) that she suffered an adverse employment action, (4) under circumstances giving rise to an inference of discrimination. *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 567 (2d Cir.2000); *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 316 (2d Cir.1999). Defendant does not dispute the first two factors. Defendant, however, contends that many of the incidents of which plaintiff complains are untimely, and, as to the incidents that are timely, the undisputed facts demonstrate that none of the conduct complained of constituted an adverse employment action, nor did her voluntary resignation occur under circumstances that could give rise to an adverse inference of discrimination. In response, plaintiff asks the Court to invoke the continuing violation exception to extend the statute of limitations. She further claims that, at a minimum, there is a genuine issue of material fact as to whether she was constructively discharged because of her age and/or gender.

### A. Which Allegations are Timely?

As a preliminary matter, we address the question of which incidents relied upon by plaintiff to support her age and gender discrimination claims are timely. Both Title VII and the ADEA require a claimant to file a discrimination charge with the EEOC within 180 days of the alleged unlawful employment action or, if the claimant has already filed a charge with a state or local agency, within 300 days of the alleged acts of discrimination. 42 U.S.C. § 2000e–5(e)(1); 29 U.S.C. §§ 626(d)(2), 633(b); *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 712 (2d Cir.1996). This requirement is analogous to a statute of limitations in that discriminatory incidents not timely brought before the EEOC will be time-barred once the plaintiff files suit in district court. *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 765 (2d Cir. 1998).

The parties do not dispute that a 300–day limitations period applies to plaintiff's gender and age discrimination claims. Thus, because plaintiff filed a charge with the CCHRO on June 30, 1997, only those incidents of age and/or sex discrimination occurring on or after September 3, 1996, would be actionable. This would encompass the September 17, 1996 training class incident, the October 16, 1996 meeting, the promotion of Bob Marone in January 1997, and all of plaintiff's meetings with Donohue in 1997 before her resignation.

■ The continuing violation exception, which plaintiff urges the Court to apply, would extend the limitations period for all claims of discriminatory acts committed under an ongoing policy or practice of discrimination, even if those acts standing alone would have been barred by the statute of limitations. *Annis v. County of Westchester,* 136 F.3d 239, 246 (2d Cir. 1998); *Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 907 (2d Cir.1997). If there is a continuing violation, the limitations period begins to run when the last discriminatory act took place. *Lightfoot,* 110 F.3d at 907. The Second Circuit has emphasized that "multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation." *Lambert v. Genesee Hosp.,* 10 F.3d 46, 53 (2d Cir.1993), *cert. denied,* 511 U.S. 1052, 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994). However, a continuing violation may be found "where there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Cornwell v. Robinson,* 23 F.3d 694, 704 (2d Cir.1994). Plaintiff asserts that, at a minimum, there is a genuine issue of material fact as to whether the

events described in the plaintiff's complaint are the result of a discriminatory policy or mechanism on the part of the defendant.

Under the "continuing violation" standard enunciated by the Second Circuit, we must determine whether there were related incidents of discrimination that the employer permitted to continue unremedied for so long as to amount to a discriminatory policy or practice. The incidents that occurred outside the limitations period that we must examine are: Donohue's criticizing plaintiff for taking a two-week vacation and disallowing this in the future, whereas other male managers were allowed a two-week vacation period; the incident involving the male manager of the Westchester Office commenting on plaintiff's breasts; Donohue's repeated criticism of plaintiff's performance; Donohue's not responding to plaintiff's request that she be permitted to manage the Westchester Office in addition to the Hartford Office, whereas certain male managers were permitted to manage two districts; the promotion of Tom Hauck and Jeff Driesen without posting the vacancy announcements; and Donohue's February 1996 visit to the Hartford office when he criticized plaintiff and commented about keeping the AMA in business. Defendant asserts that these incidents are too sporadic and distant in time from one another to constitute a continuing violation. Plaintiff asserts that the offensive and demeaning treatment of women by defendant, without remedial action, can only be the result of an ongoing policy of discrimination.

■ First, with respect to the comments by the Westchester manager concerning plaintiff's anatomy and his actions in turning up the air-conditioning, there is no indication in the record that he acted in concert with anyone else at Burns who had harassed plaintiff on the basis of her gender or that his behavior was related in any way to other incidents that occurred within the limitations period. However, the failure of Burns to address plaintiff's complaints through its Human Resources De-

partment is alleged by plaintiff and McDonnell to have been a continuing problem and is part of the discriminatory policy or practice of which plaintiff complains. The same person who discounted plaintiff's complaints about Kalle was the same person who allegedly ignored a number of her other complaints. We find this to be sufficiently continuous to render the continuing violation exception applicable to defendant's alleged failure to address this problem. *See Cruz,* 202 F.3d at 569 n. 4.

■ As for the promotions of two male District Managers without posting the notice of the vacancies, these are sufficiently related to the incident involving Marone's promotion to potentially be part of a continuum of discrimination and thus fall within the continuing violation exception.

■ Similarly, Donohue's alleged harassment of plaintiff prior to September 1997 could be considered continuous with the timely incidents involving Donohue of which plaintiff has complained. However, as we discuss further below, there is no evidence of record that Donohue's treatment of plaintiff was in any way related to her gender or age. Indeed, plaintiff has admitted that he treated other employees in the same manner. Donohue was older than she, and he never made any sexual remarks to plaintiff and never referred to her age. Thus, we have difficulty in finding that his alleged verbal mistreatment of plaintiff had any relationship to her age or gender. However, to the extent that defendant through Donohue denied plaintiff privileges and opportunities afforded to male managers in similar situations, such as allowing them to take two-week vacations or to manage two districts simultaneously, these incidents are relevant to plaintiff's discrimination claims and will be considered.

### B. Has Plaintiff Asserted a Claim for Constructive Discharge?

We next turn to the issue of whether plaintiff has asserted a claim for constructive discharge.

■ To establish "constructive discharge," a plaintiff must show that the employer deliberately made his or her working conditions so intolerable that he or she was forced into an involuntary resignation. *Stetson v. NYNEX Service Co.,* 995 F.2d 355, 360 (2d Cir.1993) (internal quotations and citations omitted). "Deliberateness exists only if the actions complained of were intended by the employer as an effort to force the employee to quit." *Leson v. ARI of Connecticut, Inc.,* 51 F.Supp.2d 135, 143 (D.Conn.1999) (internal citations omitted). "Intolerability is measured by a reasonable person standard and not by the employee's subjective feelings." *Id.* The Second Circuit has noted that it is not sufficient that an employee feels that his or her work has been unfairly criticized, or that the working conditions were unpleasant or difficult, or that the employee is dissatisfied with the work assignments he or she received, or that the employee did not receive a raise, or preferred not to continue working for the employer. *Spence v. Maryland Cas. Co.,* 995 F.2d 1147, 1156 (2d Cir.1993) (citations omitted); *Stetson,* 995 F.2d at 360 (citations omitted). The Court has emphasized that the standard for constructive discharge is "indeed a demanding one." *Martin v. Citibank, N.A.,* 762 F.2d 212, 221 (2d Cir.1985) (resignation due to humiliation over employer's loud mention of the employee's having to take a polygraph test and over her burdensome working conditions did not amount to a constructive discharge).

■ In the instant case, we question whether plaintiff has alleged facts suffi-cient to meet the demanding standard of intolerability given the fact that she remained at Burns for more than a year after the point in time when she states that she had decided to leave.[5] Despite what she claims were intolerable working conditions, plaintiff remained with defendant until April, 1997. She has admitted that she did not resign until she found another job, and certainly a strong argument could be made that her resignation was voluntary.

However, we need not decide this claim on that basis for plaintiff has alleged no facts from which a reasonable trier of fact could conclude that defendant Burns intentionally created these conditions *for the purpose of inducing her resignation.* To the contrary, there is evidence that plaintiff was offered another district to manage, that she was given a raise, that her performance was considered good, and that she even received a substantial bonus in 1997.

Therefore, we find that plaintiff has failed to produce sufficient facts to establish a *prima facie* case of constructive discharge and grant defendant's motion for summary judgment as to this claim.

## II. Failure to Promote Based on Gender and Age

Plaintiff also alleges that she was denied promotions because of her age and sex in violation of the ADEA[6] and Title VII.

■ In order to establish a *prima facie* case for failure to promote, the plaintiff must allege: (1) that she is a member of a protected class; (2) that her job perfor-

---

5. Plaintiff testified that, following the February 1996 meeting with Donohue when the "AMA" remark was made, she began to look for a new job. (Pl.'s dep. at 66 & 98). In her affidavit, she stated that it was late 1996 or early 1997 when she decided that she could not take the atmosphere and treatment much longer. (Pl.'s Aff. ¶ 8).

6. Although plaintiff alleges in her complaint that her failure-to-promote claim is based upon age and gender, she appears to have abandoned her age claim in her opposition to the motion for summary judgment. However, even assuming that she has not abandoned this claim, there is no factual support for it in the record. Donohue was older than plaintiff, as was Driesen, one of the three individuals promoted. Plaintiff has alleged only one age-related comment that was made to her, a co-worker's calling her "grandmother." There are no facts in the record from which a reasonable trier of fact could conclude that age was a factor in plaintiff's not being promoted. That claim is dismissed.

mance was satisfactory; (3) that she applied for and was denied a promotion; and (4) that the position remained open and the employer continued to seek applicants. *Cruz v. Coach Stores*, 202 F.3d at 565. The first two elements are not at issue in this case. As to the third element, it is undisputed that plaintiff did not apply for the three promotions of which she complains. Of course, plaintiff states that this was because she never knew about them.

In *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710 (2d Cir.1998), the Second Circuit held that in a failure-to-promote case, *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), generally require a plaintiff to allege that she applied for a specific position and was rejected therefrom, rather than merely asserting that on several occasions she generally requested promotion. The Court noted that this "general mandate" ensures that employers will not be unfairly burdened in their promotion efforts by having to consider individuals who may have generally expressed an interest in a promotion. The Court, however, left open the possibility of a valid failure-to-promote claim arising in the situation where the employer refused to accept applications for positions or handpicked individuals for promotion to a position without considering applicants. *Brown*, 163 F.3d at 710–11; *see Mauro v. Southern New England Telecommunications, Inc.*, 208 F.3d 384, 386–87 (2d Cir. 2000).

It is this latter situation that plaintiff has alleged—that Donohue hand-picked individuals for promotion without posting the positions and without considering other individuals for promotion. Donohue does not contend otherwise; he states that it was neither his practice nor the practice of Burns to post these positions. Plaintiff counters that this practice was a mechanism for preventing women from learning of promotional opportunities.

We have no indication that plaintiff had ever indicated an interest in these types of promotions—in sales, operations, or as director of client services. Nevertheless, assuming *arguendo* that plaintiff has met the remaining elements of her *prima facie* case, we find that for other reasons summary judgment in favor of defendant is appropriate on plaintiff's failure-to-promote claim. *See Mauro*, 208 F.3d 384, 387.

In response to plaintiff's discrimination claim, defendant proffered legitimate, non-discriminatory reasons for the promotions that it made. Hauck had extensive sales experience; Driesen had more seniority than plaintiff and had prior experience as an executive vice president of a shipping company; Marone's position had been eliminated and defendant did not think that plaintiff would consider his position a "promotion" since it paid less than she was currently making (this being the response that she has made with respect to the larger Florida and North Carolina Districts that were offered to her). Plaintiff has offered no evidence that these reasons were pretextual, nor has she produced any evidence that sex discrimination in any way motivated defendant's failure to promote her. *Id.* (citing *Fisher v. Vassar College*, 114 F.3d 1332, 1338–39 (2d Cir. 1997) (en banc)). In fact, plaintiff in her deposition admitted that she did not know what the qualifications were for these positions and could not say whether she was more or less qualified than the persons promoted. (Pl.'s dep. at 64).

### III. Plaintiff's Hostile Work Environment Claim

In order to prevail on a hostile work environment claim under Title VII, a plaintiff must establish two elements. *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997). First, she must prove that the harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v.*

*Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal citations and quotations omitted); *see also Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). The hostile environment must be both subjectively and objectively offensive: one that a reasonable person would find hostile or abusive, and that the victim did, in fact, perceive to be so. *Harris,* 510 U.S. at 21–22, 114 S.Ct. 367. The Supreme Court in *Harris* instructed that a court should look to all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with the employee's work performance. *Id.* at 23, 114 S.Ct. 367. The incidents "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Faragher v. City of Boca Raton,* 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). "[O]ne of the critical inquiries in a hostile environment claim must be the environment. Evidence of a general work atmosphere . . .—as well as evidence of specific hostility directed toward the plaintiff—is an important factor in evaluating the claim." *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 149 (2d Cir.1997) (quoting *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1415 (10th Cir. 1987)) (internal quotations and emphasis omitted). The Supreme Court has repeatedly emphasized that simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment. *See, e.g., Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). Thus, to prevail on a hostile work environment claim, the plaintiff must show that the workplace was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of her employment. *Gallagher v. Delaney,* 139 F.3d 338, 347 (2d Cir.1998); *Tomka v.*

*Seiler Corp.,* 66 F.3d 1295, 1305 (2d Cir. 1995).

Additionally, the plaintiff must show that a specific basis exists for imputing the conduct that created the hostile environment to the employer. *Perry v. Ethan Allen,* 115 F.3d at 149; *Murray v. New York Univ. College of Dentistry,* 57 F.3d 243, 249 (2d Cir.1995). This second element will be discussed more fully below.

### A. Has Plaintiff Established a Hostile Work Environment Claim?

The analysis of the hostile working environment theory of discrimination is the same under Title VII and the ADEA. *Brennan v. Metropolitan Opera Ass'n,* 192 F.3d 310, 318 (2d Cir.1999). A work environment will be considered hostile if a reasonable person would have found it to be so and if the plaintiff subjectively perceived it. *Gallagher,* 139 F.3d at 347. A plaintiff must also demonstrate that she was subjected to the hostility because of her membership in a protected class. In other words, an environment that is equally harsh for both men and women or for both young and older employees does not constitute a hostile working environment under the civil rights statutes. *Brennan,* 192 F.3d at 318 (citing *Oncale,* 523 U.S. at 80, 118 S.Ct. 998). The courts have repeatedly held that isolated minor acts or occasional episodes do not warrant relief. Rather, the plaintiff must prove that the incidents were "sufficiently continuous and concerted" to be considered pervasive. *Perry v. Ethan Allen,* 115 F.3d at 149, or that a single episode was severe enough to establish a hostile working environment. *Richardson v. New York State Dep't of Correctional Service,* 180 F.3d 426, 437 (2d Cir.1999).

Initially, we hold that no triable issue of fact exists as to plaintiff's claim of age-based harassment. Her complaint does not refer to a single age-related incident of harassment and her deposition makes reference to only a single incident involving a co-worker's calling her "grand-

mother." This isolated remark by a co-worker does not meet the requirements of a hostile work environment set forth above.

■ As to her claim of sex-based harassment, plaintiff has alleged a series of incidents, several of which are confirmed by another female manager, that plaintiff clearly perceived as harassing[7] and which a reasonable person in plaintiff's position could likewise perceive as harassing, particularly given the fact that these statement were made in male-dominated settings. She alleges that she was subjected to repeated incidents of vulgar remarks of a sexual nature at business functions, including crude comments and jokes at business meetings by officers of defendant; comments were made at a training class run by the Human Resources Department that women have no place in the security industry because of their children and monthly problems; when plaintiff took offense at a remark at a meeting that "we are all grown men," she was subjected to sneers, jokes, and told to "go get us some coffee;" traditionally male-dominated activities were scheduled after a business meeting and the women's objections to these activities were met with a sarcastic retort; demeaning remarks were made to plaintiff and sexual activities were the subject of conversation at a business lunch at which her supervisor was present. Male district managers were allegedly treated differently than plaintiff. They were allegedly afforded opportunities to manage more than one district not offered to plaintiff and male managers were given assistance with account problems not offered to plaintiff. The only other female District Manager in the Northeast Business Unit has testified under oath that she perceived the environment as "hostile" and "abusive."

■ Plaintiff has also accused Donohue, her supervisor, of creating a hostile work environment. However, plaintiff's complaints against Donohue concern his criticism of her, his ridiculing her, his being a "tough boss to work for." (Pl.'s dep. at 85). She admits, however, that he was this way with everyone, and that he never said anything to her of a sexual nature. The only exceptions were his presence at meetings when sexual activities were discussed in plaintiff's presence and his allegedly refusing to give plaintiff opportunities or privileges afforded male managers. Although plaintiff may have been subjected to verbal harassment by Donohue, there is little evidence that this verbal harassment of plaintiff was because of her sex.

Whether a reasonable person would objectively perceive the totality of these incidents as creating a hostile work environment is a matter frequently left to the sound discretion of reasonable jurors. *Richardson*, 180 F.3d at 437. Evaluating the severity and pervasiveness of a harasser's conduct on summary judgment is often difficult and, in many cases, inappropriate. *Ponticelli v. Zurich American Ins. Group*, 16 F.Supp.2d 414, 429 (S.D.N.Y.1998); *DiLaurenzio v. Atlantic Paratrans, Inc.*, 926 F.Supp. 310, 314 (E.D.N.Y.1996); *see also Gallagher*, 139 F.3d at 343 (noting the "dangers of robust use of summary judgment" in sexual harassment cases and the difficult problems of proof inherent in these cases). Even when the facts are undisputed (which is not the case here), "summary judgment is appropriate only where application of the law to those undisputed facts will reasonably support only one ultimate conclusion." *Richardson*, 180 F.3d at 438.

In this case, drawing all reasonable inferences in plaintiff's favor, a reasonable jury could find that the totality of the incidents of which plaintiff complains were sufficiently severe and pervasive to alter plaintiff's working conditions for the

---

**7.** Defendant suggests that there is at least some question as to whether plaintiff perceived her environment to be hostile based upon her admission that she herself used swear words. We do not view plaintiff's admission to that effect as negating her unrefuted testimony concerning her perception of her workplace and her complaints to Human Resources as well as to co-workers about the harassment.

worse. As the Court stated in *Richardson*, "[r]easonable jurors may well disagree about whether these incidents would negatively alter the working conditions of a reasonable employee. But the potential for such disagreement renders summary judgment inappropriate." 180 F.3d at 439.

### B. Is Defendant Liable for the Harassment?

The second question that must be addressed is whether defendant can be held liable for these acts of harassment. A plaintiff pursuing a hostile environment claim must establish a basis, rooted in common-law agency principles, on which to hold an employer liable for the acts of its employees. *Meritor Sav. Bank*, 477 U.S. at 72, 106 S.Ct. 2399. Plaintiff's claims fall into two categories: those involving her superiors; and those involving co-workers. Different standards apply to each category.

 In *Faragher v. City of Boca Raton*, the Supreme Court held that

> [a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ.Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible em-

ployment action, such as discharge, demotion, or undesirable reassignment. 524 U.S. at 807, 118 S.Ct. 2275.

 In this case, the alleged harassment did not result in any tangible employment action being taken against plaintiff. Thus, defendant could raise the affirmative defense set forth in *Faragher* to plaintiff's claims of harassment by her superiors. Although defendant had an antiharassment policy in place, as well as complaint procedures, plaintiff has alleged that her repeated complaints to the Human Resources Department were not addressed and that no corrective action was taken. This claim is supported by McDonnell.

 In contrast to the presumption of absolute liability when the harasser is a supervisor, the Second Circuit has held that employer liability for a hostile work environment created by co-workers will attach only if the employer is negligent, that is, when the employer has "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Murray*, 57 F.3d at 249; *see also Richardson*, 180 F.3d at 441; *Quinn v. Green Tree Credit*, 159 F.3d at 767; *Perry v. Ethan Allen*, 115 F.3d at 149; *Torres v. Pisano*, 116 F.3d 625, 634 (2d Cir.), 522 U.S. 997, 118 S.Ct. 563, 139 L.Ed.2d 404 (1997). In this case, the issue is not lack of a reasonable avenue for complaint. Rather, it is the employer's lack of response to the complaints. Construing the facts in plaintiff's favor, the record shows that plaintiff complained to Human Resources on a number of occasions and repeatedly her complaints were met with either a denial that the vulgar comments were of a sexual nature, or with a sympathetic acknowledgment that the Human Resources Director had been subjected to similar discriminatory treatment. Furthermore, some of the incidents occurred in the presence of the Human Resources Director. Indeed, one of the comments was made at a Human Resources meeting. Yet, there is nothing in the rec-

ord to indicate that these incidents were addressed. Defendant asserts that plaintiff never followed its internal complaint procedures. However, based upon Human Resources' lack of response to plaintiff's verbal complaints, a jury could well find that plaintiff reasonably assumed that pursuing these complaints further would have been an exercise in futility. At a minimum, there is an issue of fact as to whether the employer's action was effectively remedial and prompt. Thus, summary judgment is inappropriate. *See Richardson*, 180 F.3d at 441.

Accordingly, for purposes of summary judgment, we hold that plaintiff has alleged sufficient facts to establish a basis for imputing the conduct that created the hostile environment to defendant Burns, her employer.

## IV. Plaintiff's Equal Pay Act Claim

 In her Complaint, Plaintiff has also alleged a violation of the Equal Pay Act (although she does not address this claim in her opposition to the Motion for Summary Judgment). The EPA prohibits employers from discriminating among employees on the basis of sex by paying higher wages to employees of the opposite sex for "equal work." *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir.1999). In order to set forth a *prima facie* case of salary discrimination under the EPA, the plaintiff must demonstrate (1) that the employer pays different wages to employees of the opposite sex; (2) that the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and (3) that the jobs are performed under similar working conditions. *Id.* Unlike Title VII, however, the EPA does not require a plaintiff to establish an employer's intent. *Id.* at 135–36. Once the plaintiff makes out a *prima facie* case of discrimination, the burden then shifts to the employer to demonstrate that the wage disparity is due to a seniority system, a merit system, a system which measures earnings based upon quantity or quality of production, or a differential based on any other factor other than sex. *Ryduchowski v. Port*

*Auth. of New York and New Jersey*, 203 F.3d 135, 142 (2d Cir.2000) (citing 29 U.S.C. § 206(d)(1)). Once the employer proves that the wage disparity is justified by one of the four affirmative defenses of the EPA, the plaintiff may counter by producing evidence that the reasons the defendant seeks to advance are actually a pretext for sex discrimination. *Id.*

 In support of her EPA claim, plaintiff has alleged that in early 1997, she questioned Donohue as to why she had not received a salary increase since March 1995. Shortly thereafter, she received a 1% increase and, upon discussing this increase with other male managers, was "led to believe" that they had received annual and more substantial salary increases. (Pl.'s Compl. ¶ 42). She further states that "[s]ince plaintiff had not been given a performance review since 1993, she had no knowledge of the criteria for pay increases." *Id.* at ¶ 43. These allegations do not meet the pleading requirements for stating a claim under the EPA.

Plaintiff has failed to cite to a single male manager who received a higher salary than she. To the contrary, defendant has provided a sworn affidavit of the current Director of Human Resources, Christine Hirschl, who testified that district manager pay was tied to district size, business revenue growth, and the extent to which a district manager met his or her goals, and that the 1% pay increase that plaintiff received in 1996 was larger than the pay increases given to six of the male General Managers in the Northeast Business Unit. Additionally, she stated that no male manager with an overall performance rating of "3" (or worse) received any increase at all, in contrast to plaintiff who was given a 1% increase. Further, at the time of her increase, plaintiff was already making the same or more than half of the male managers in her Business Unit (although as noted above, we have no meaningful way to compare these individuals to plaintiff). Plaintiff's conjecture that other male managers made a higher salary than

she will not support a claim under the Equal Pay Act. *See Victory v. Hewlett–Packard Co.,* 34 F.Supp.2d 809, 825 (E.D.N.Y.1999); *Hill v. Pinkerton Sec. & Investigation Services, Inc.,* 977 F.Supp. 148, 156 (D.Conn.1997). Therefore, summary judgment is granted in favor of defendant on this claim set forth in Count Three of the complaint.

## V. Plaintiff's Retaliation Claim

 Plaintiff's final federal discrimination claim is that defendant retaliated against her once she complained to Donohue in January 1997 about defendant's promotion and pay increase policies. Title VII provides that it "shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [such employee] has opposed any practice made an unlawful practice by this subchapter." 42 U.S.C. § 2000e–3(a). Retaliation claims are evaluated under the burden shifting rules of *McDonnell Douglas v. Green. See Quinn v. Green Tree Credit,* 159 F.3d at 764. Thus, to establish a *prima facie* case of retaliation, a plaintiff must show (1) participation in a protected activity that is known to the defendant; (2) an employment decision or action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse decision. *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d at 713.

 In this case, plaintiff's complaints to Donohue about what she believed to be discriminatory conduct by defendant would meet the first requirement. However, plaintiff never suffered an adverse employment action thereafter. While there were a number of incidents involving offensive comments after plaintiff's conversation with Donohue in January 1997, we need not decide whether these were sufficiently severe to reach the level of an "adverse" employment action since there is nothing to indicate that the few incidents were causally related to plaintiff's complaints to Donohue. *See Richardson,* 180 F.3d at 446 (adopting the view that unchecked retaliatory harassment, if sufficiently severe,

may constitute adverse employment action so as to satisfy the second prong of the *prima facie* case). No other adverse employment action was taken against plaintiff. Plaintiff had already made the decision to look for another job and in March 1997 gave notice of her intent to resign. Plaintiff has not alleged any adverse action against her by the employer as a result of her complaints to Donohue about the promotions and her pay. In fact, plaintiff actually received a raise. Therefore, we find that plaintiff has failed to allege sufficient facts to establish a *prima facie* case of retaliation and grant summary judgment in favor of defendant on this claim.

## VI. Plaintiff's Discrimination Claims Under the CFEPA

 In Count IV of her complaint, plaintiff alleges that, by virtue of the alleged incidents described above, defendant discriminated against plaintiff in compensation and in the terms, conditions, and privileges of employment because of her age and sex, in violation of C.G.S.A. § 46a–60(a)(1); defendant discriminated against her because she opposed and complained about discriminatory practices, in violation of C.G.S.A. § 46a–60(a)(4); and that defendant sexually harassed plaintiff, thus creating a hostile work environment, in violation of C.G.S.A. § 46a–60(8)(C). It is well-settled that the same legal standards apply to claims under CFEPA as to claims under Title VII and the ADEA. *Newtown v. Shell Oil Co.,* 52 F.Supp.2d 366 (D.Conn.1999); *Gorman v. Earmark, Inc.,* 968 F.Supp. 58 (D.Conn.1997); *Levy v. Commission on Human Rights and Opportunities,* 35 Conn.App. 474, 646 A.2d 893 (1994), *aff'd,* 236 Conn. 96, 671 A.2d 349 (1996). Accordingly, our rulings with respect to plaintiff's discrimination claims under Connecticut's employment discrimination statute are the same as those under the comparable federal statutes. Summary judgment is granted in favor of defendant on all claims except plaintiff's claim of sexual harassment.

*CONCLUSION*

For the reasons set forth above, Defendant's Motion for Summary Judgment is GRANTED in part and DENIED in part. Defendant's Motion is DENIED as to Plaintiff's claim of Sexual Harassment under Title VII as set forth in Count I and under C.G.S.A. § 46a–60(a)(4) as set forth in Count IV. In all other respects, Summary Judgment is GRANTED in favor of Defendant as to the remaining claims in Counts I and IV and as to Counts II and III. This case will be added to the July Trial Calendar.

SO ORDERED.